IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JEANNETTE M. DEGARMO,

　　　　　Plaintiff,

v.　　　　　　　　　　　　　　　　　　Civil Action No. 3:05CV88
　　　　　　　　　　　　　　　　　　　　　　(Judge Keeley)

LINDA S. McMAHON,[1]
ACTING COMMISSIONER OF
SOCIAL SECURITY,

　　　　　Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner")

denying her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security

Act ("Act"), 42 U.S.C. §§ 1381-1383f.  The matter is awaiting decision on Plaintiff's Statement of

Errors [Docket Entry 31] and Defendant's Motion for Summary Judgment [Docket Entry 32],  and

has been referred to the undersigned United States Magistrate Judge for submission of proposed

findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I.  Procedural History

Jeannette M. DeGarmo ("Plaintiff") filed her current application for SSI on July 1, 2002,

alleging disability beginning March 1, 1976, due to severe depression, fibromyalgia, severe anxiety,

and weakness (R. 454, 460).  The application was denied initially and on reconsideration (R. 430,

---

[1] Linda S. McMahon became the Acting Commissioner of Social Security, effective
January 22, 2007, to succeed Jo Anne B. Barnhart.  Under Fed. R. Civ. P. 25(d)(1) and 42 U.S.C.
§ 405(g), Linda S. McMahon is automatically substituted as the defendant in this action.

431). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") James Burkes held on October 2, 2003 (R. 672). Plaintiff, represented by counsel, testified on her own behalf, along with witness Robert Harris and Vocational Expert Karen Krull ("VE"). By decision dated May 7, 2004, the ALJ denied benefits (R. 28). The Appeals Council denied Plaintiff's request for review on June 10, 2005, rendering the ALJ's decision the final decision of the Commissioner (R. 9).

Plaintiff filed her Complaint in this Court on August 11, 2005 (D.E. 1). Defendant filed her Answer to the Complaint on September 29, 2005 (D.E. 14). Plaintiff filed a Motion to Remand on January 4, 2006 (D.E. 17), and Defendant filed her Response on January 18, 2006 (D.E. 17). The undersigned United States Magistrate Judge entered a Report and Recommendation on March 13, 2006, recommending that Plaintiff's Motion to Remand be denied, but that Plaintiff be permitted to file a Motion for Summary Judgment (D.E. 20). Defendant filed Objections to the Report and Recommendation, arguing that Plaintiff, having filed a Motion for Remand in this matter, should not be permitted to file a subsequent substantive motion (D.E. 21). On September 29, 2006, the District Court adopted the undersigned Magistrate Judge's Report and Recommendation (D.E. 24), ordering Plaintiff to file her Motion for Summary Judgment within 30 days.

On November 9, 2006, the undersigned entered a Report and Recommendation finding that Plaintiff had filed no Motion for Summary Judgment by the date ordered by the District Judge, and recommending that the case be dismissed for failure to prosecute and for failure to obey the Court's Order (D.E. 25). On November 17, 2006, Plaintiff filed her Motion for Relief from Recommended Order, representing to the Court that neither her local counsel nor Ohio counsel were aware of any action by the Court subsequent to the March 27, 2006, filing of Defendant's Objections to the first Report and Recommendation, due to "a problem in the CM/ECF system which caused both of

Plaintiff's counsel to not receive any documentation for the Court and the U.S. Attorney." (D.E. 26).

The Honorable W. Craig Broadwater held a status conference in this case on November 28, 2006, after which he denied as moot the November 9, 2006, Report and Recommendation and ordered Plaintiff to file her Motion for Summary Judgment on or before January 8, 2007. District Judge Broadwater referred the case back to the undersigned United States Magistrate Judge. Plaintiff filed her "Statement of Errors" on January 8, 2007 (D.E. 31) and Defendant filed her Motion for Summary Judgment on February 2, 2007 (D.E. 32).

## II. Statement of Facts

Plaintiff was born on December 15, 1957, and was 44 years old years old at the time of the ALJ's decision (R. 28, 454). She went to school through the 10th grade and obtained her GED and has no past relevant work (R. 28, 456).

Plaintiff applied previously for SSI benefits in March 1996 (R. 421). The claim was denied initially and on reconsideration, and was eventually withdrawn by Plaintiff. Plaintiff filed a second application for SSI on July 18, 2000, alleging inability to work since May 1995, due to arthritis, depression, anxiety, weakness in muscles, fibromyalgia, pain, fatigue, and brain injury from a car accident in 1976 (R. 71). That claim was also denied initially and on reconsideration and an ALJ held a hearing on February 14, 2002 (R. 421). Plaintiff was represented by counsel at the hearing. The ALJ's Decision for that claim indicates he considered evidence through February 8, 2002 (R. 424). He entered his Decision on April 25, 2002, finding that Plaintiff was mildly limited in her activities of daily living, moderately limited in concentration, persistence or pace, and moderately limited in social functioning (R. 425). She had never had any episodes of decompensation. He concluded that Plaintiff retained the residual functional capacity to perform work at the light

exertional level with 1-2 step instructions, avoiding decision-making, avoiding the public, groups of people and teamwork, avoiding jobs requiring acute vision, avoiding competitive production rate pace, and needing a 4th grade level of reading, spelling, and math. The Vocational Expert testified there would be a significant number of jobs in the national economy that Plaintiff could perform, despite those limitations. The ALJ therefore found Plaintiff was not under a disability at any time through the date of his decision (R. 429). Plaintiff, who was represented by counsel, did not appeal that decision to the Federal Court, thereby making the ALJ's April 25, 2002, decision the final decision regarding that claim.

The prior ALJ's April 25, 2002, decision is binding on both parties as concerns the evidence that existed prior to that time. See 20 C.F.R. § 416.1455. The undersigned therefore considers only the evidence produced after the hearing, briefly reciting earlier evidence only insofar as to provide a background for the claim.

Plaintiff was struck by a car while crossing the street in 1976, when she was 17 years old. The evidence indicates she suffered a broken pelvis and head injury among other serious injuries.

On March 23, 1994, Plaintiff was seen by neurologist Srini Govindan, M.D., for complaints of weakness in the neck, shoulders, arms and hands, and numbness in the right hand with slight pain (R. 116). Lab work was normal, as was an EMG. However, an MRI of the brain did show an area of change in the left parietal lobe. Plaintiff also underwent motor nerve conduction studies; bilateral median nerve F-wave at the wrist; sensory nerve conduction; needle examination of the left upper extremity (R. 525). The studies were all normal.

In June 1995, Dr. Govindan advised that Plaintiff's cervical spine x-ray showed mild narrowing (R. 114). All her blood work was normal. Neurological exam was normal. She did have

"some residual discomfort and pain in the neck on the left side from her cervical disk disease." Plaintiff reported being depressed. Dr. Govindan advised her she should be evaluated by a psychiatrist before being started on any medications, but she wanted to get treatment started. Dr. Govindan also advised "some conventional physical therapy twice a week for six weeks."

A July 11, 1995, cervical spine x-ray showed Plaintiff's cervical curve was normal (R. 508). The vertebral bodies were all normal in stature and alignment. C1-C2 was normal. Flexion and extension films were within normal limits and soft tissue was not remarkable. There was a mild degree of disc space narrowing at C3-4, 4-5 and 5-6 and some mild degenerative change at the C5-6 level where there may be very minimal impingement. The impression was "Disc space narrowing at multiple levels as described with some associated arthritic change at the C5-C6 level."

A SPECT perfusion study was completed on August 7, 1995, for Plaintiff's complaints of "history of auto accident in 1976 with loss of consciousness, now having weakness, headache, dizziness, lightheadedness, blurred vision, and memory problems, rule out seizures." The study was abnormal with relative decrease in the left frontal area with hyperemia in the left posterior temporal region; however, clinical correlation was suggested (R. 521).

On November 29, 1995, Plaintiff presented to "Family Connections" for complaints of "Everything – Depression – Hard time dealing with health problems from being hit by a car – not functioning properly" (R. 324). It was subsequently noted that Plaintiff was divorced and her daughter was age 18 and a senior in high school, living at home. Plaintiff's income was from Aid to Families with Dependent Children ("AFDC"), which would be cut off when her daughter graduated from high school. Plaintiff "wonders and worries about future when her funding is cutoff– No support from ex-husband. Recommended psychological evaluation."

Plaintiff began counseling sessions with a social worker/counselor, that lasted from about December 1995 up through the present. The counselor came to Plaintiff's home for sessions (R. 233). Upon initial mental status examination the counselor noted that Plaintiff was dressed casually but stylishly. She wore make up and mentioned she had made a special effort to "look nice." Her posture was comfortable, her movement normal, and her speech was clear. She was cooperative. Her affect was normal and appropriate and she expressed no suicidal ideation. She was fully oriented. She related that she had broken up one year earlier with a man with whom she had a 7-year relationship. She believed that when her daughter graduated from high school she would marry the man, and "[t]his would have provided her with health insurance and some security."

A January 12, 1996, EEG was normal (R. 519). IQ testing at about this time indicated Plaintiff's scores were 84 verbal, 78 performance, and 79 full scale. The psychologist believed Plaintiff was a candidate for vocational rehabilitation services, and believed she had the cognitive skills necessary to effectively work as a food service handler, a job Plaintiff said she had done before briefly, and enjoyed.

On May 28, 1996, Plaintiff's welfare benefits terminated (R. 307). Plaintiff told her counselor she had "had insight into why she ha[d] waited so long to get help for herself. Her concern was that DHHR would take her daughter away from her if they knew she was having emotional difficulties so she waited until daughter turned 18."

On June 4, 1996, Plaintiff was admitted to the hospital due to "suicidal ideation" (R. 121). Her treating physician, D. Farris, wrote as follows:

> This 38 year old white female had initially made contact with Psychiatric Center as an outpatient in April of 1996. At that time she was referred to us by Family Connections for evaluation of her depression. The patient had been in outpatient counseling at Family Connections and had complained of symptoms of depression. She came to the outpatient clinic and reported the symptoms of depression and no

benefit of previous medication Zoloft and Nortriptyline . . . . In May she came to see Dr. Day, who was covering for the psychiatric center here at Weirton Medical Center and Dr. Day had recommended the patient participate in the partial hospitalization program and continue with her counseling and pharmacotherapy. The patient states she was unable to participate in the partial program because of transportation problems. She had been hooked up with vocational rehabilitation services in the past, but also did not follow through with continued excuses for inability to follow-up with vocational rehab. The patient requested from Dr. Day justification for disability so she could continue getting her Welfare. She states she is unable to work due to her depression. Dr. Day would not write the patient a letter stating that she was unable to work and that week the patient had a number of calls to the crisis line complaining of suicidal ideation. She was instructed by the crisis line workers to come to the ED for evaluation and admission to treat her suicidal intent. The patient did not ever come to the hospital or Emergency Department, but she did keep her next outpatient appointment with myself. Today she presented to the outpatient office with request for letter for disability, and states that for the past week or so she has been suicidal and she is unable to work and needs letter for disability. When confronted about her suicidal ideation, the patient was reluctant to let suicidal ideation go and states that she was so distressed and stressed out that she had been thinking of suicide daily. The patient was admitted to the 9th floor voluntarily. The patient gives a past psychiatric history of treatment as an outpatient at Family Connections and denies any previous in-patient treatment. The patient's medical history is noncontributory and she denies any significant medical history. She states she does have back pain and muscle problems and takes Flexeril occasionally at night, 10 milligrams.

Upon examination Plaintiff had normal range of motion and appeared to be in no physical distress (R. 126). Mental Status Examination showed her to be alert and oriented. She continued to voice suicidal ideation but when instructed that she would be admitted, tried to recant the suicidal intent. Speech was normal and there was no psychomotor agitation or retardation. The doctor noted:

She has her hair all made up and teased. Her make-up is on very neat. She is smiling and appropriate. There is no dysphoria or flat affect or depressed mood present. She is dressed very nicely and continued to voice symptoms of depression, but does not appear depressed. She does afford good eye contact. Her thought process is goal directed, logical, she denies auditory or visual hallucinations. There were no delusions noted. Her cognitive functioning was grossly intact. She admits to this writer in the outpatient setting that she is suicidal, but when on the unit tells the nursing staff that this is just a stress, and she is overwhelmed by the stress of not

having a job and no money and no insurance, and the she needs to have her disability.  The patient has a very poor judgment and no insight.

Dr. Farris diagnosed Rule Out Major Depression; Rule Out Malingering; and Rule Out Axis II Component.    He planned to continue Plaintiff on her anti-depressants and provide for psychological testing and evaluation.  He wanted "to try to evaluate and assess whether or not this is a true depressive disorder, whether or not the patient is malingering for secondary gain."

The next day  Plaintiff's treating physician noted that Plaintiff stated she did not know why she tested positive for benzodiazepine.  She denied taking any drugs except those prescribed for her (R. 133).   She continued stating she was depressed, and her depression increased as the day progressed.  The doctor did not believe Plaintiff showed objective evidence of depression, but was concerned she would try to "act out" to convince him of the seriousness of her symptoms and "how much she needs to be on disability."  He was afraid this would force her to act out her symptoms and suicidal ideation.  He was "under the impression the suicidal ideation was a manipulation to show me the seriousness of the need for disability."

Plaintiff was evaluated by psychologist T. David Newman, Ph.D. later that day (R. 131).  He opined the evaluation results were supportive of a personality disorder with histrionic and dependent features in an individual with poor coping skills currently dealing with situational stressors. Depressed mood was moderately supported and considered to be experienced primarily as anxiety/apprehension.

The next day Dr. Farris wrote that Plaintiff was not participating well in Group and community activities.  She said she could not "because of her brain damage from a motor vehicle accident 20 years ago."  He noted she "had no symptoms prior to her daughter turning 18 and then her loosing [sic] her social security."  He also wrote:

This patient is becoming more clear and she is manipulating and attempting to gain disability and a check from the state but my concern is that she will try to show us how serious she does have [sic] and act out some threat of suicide to try to make sure she gets her benefits.

At this time she is denying suicidal ideation intent and plan because she is requesting to be discharged. One of the discharge criteria I had told the patient was that she needed to have a plan for her future and a plan for follow up care. She told me her plan was to find a rich man and marry him. To this patient, everything comes down to her needing more money and she is trying to manipulate and find any way to get her needs met besides taking on responsibility for herself.

Upon Plaintiff's discharge from the hospital three days later, Dr. Farris wrote:

This 38 year old white female came to my office as an outpatient, the first time in April stating that she was disabled by her depression. She wanted treatment for it and disability. The patient was seen in May by the covering physician, Dr. Day, who refused to write her a letter for disability in which she promptly began complaining of suicidal ideation. The patient came to her next outpatient appointment with myself still complaining of suicidal ideation and was admitted through the outpatient office directly to the inpatient unit. Later that day after admission, the patient recanted and denied her suicidal intent stating that she was just overwhelmed by her inability to have a job, her lack of money and support and her need for medical assistance. The 38 year old white female presented subjectively with depression but there was no objective or vegetative symptoms of depression. It appeared to this writer that there was significant secondary gain for her presentation and for her symptomology. She did not display any symptoms of depression except for some anxiety and being uncomfortable. She did not have a sleep or appetite disturbance. She was also positive for benzodiazepine in her urine but denied any benzodiazepine use. I feel that this patient has a significant access to and is manipulating for secondary gain but psychological testing does reveal a valid profile and depression is identified. We continued the patient's treatment of Zoloft, she was on Nortriptyline which we switched to Trazadone which seems to be more beneficial and we upped her dose of Zoloft which she states she is tolerating well. The patient was very reluctant to make a plan for her follow up and for her future but she is also reluctant to try to support herself. At this time we are discharging the patient to home. Since the day of admission she has been denying suicidal ideation and for the past three days she has as well. She seems to be responding to our support and our encouragement to support herself, find a job and stay well . . . . The patient will be encouraged to participate in vocational rehabilitation and try to support herself.

Plaintiff's final diagnosis upon discharge was Depressive Disorder NOS and Personality

Disorder NOS with dependent and histrionic features.

On October 5, 2001, Plaintiff had a cervical spine x-ray that showed no fracture or subluxation; normal vertebral body height and cervical spine alignment; moderately narrowed disc spaces from C3-4 to C6-7; and normal atlantoaxial space and prevertebral soft tissue. The impression was "Degenerative Changes." (R. 408).

A lumbar series performed that same day showed "Questionable L5 bilateral spondylolysis without spondylolisthesis." The L1-2 and L2-3 disc spaces were mildly narrowed.

Plaintiff's administrative hearing regarding her previous (2000) claim was held on February 14, 2002. On February 15, 2002, Plaintiff telephoned her treating family physician Dr. DePetro stating that she was applying for Social Security benefits due to disability, and asking the doctor to write a statement stating she was unable to work (R. 643). A notation by someone in the doctor's office, however, states: "This is on the basis of [] anx./dep. Psych should write."

On February 26, 2002, Plaintiff presented to the hospital emergency room with complaints that "over the past week she has been feeling depressed secondary to her not getting her Social Security. She feels like killing herself. She states she wants to jump off of a bridge" (R. 565). Upon physical examination she had no musculoskeletal pain and no headaches or numbness. She was admitted to the Psychiatric Unit for suicidal ideation and depression.

On March 4, 2002, Plaintiff presented for an initial outpatient session with Lawrence Sutton, Ph.D. (R. 415). He noted that Plaintiff was recently hospitalized at the Weirton Psychiatric Center and left the center seeking additional psychotherapy through him. She still had her long-standing counselor from Family Connections. When asked why she came to the appointment, she stated "because she has depression and anxiety." Her depression was due to "physically, I'm not good." She again stated she'd had problems since being hit by a car in 1976. She said she had been very

10

depressed since then, very fatigued and not able to sustain much of a pace. Physically, she stated the problem was that she had arthritis and "pain and weakness." She said that if she were to attempt to do the dishes one day that was "essentially all the work that she could physically take and that fatigues her to such an extent that she would not be able to do anything further."

Plaintiff told Mr. Sutton "her attempt leading to the hospitalization was an expressed thought to jump off of a bridge which she stated that she did not do but she called for help. She states that at one other point she had considered suicide, as well which led to her initial hospitalization in 1996."

Plaintiff lived in her own apartment. She did her own laundry, cooking, and shopping but said the cooking consisted only of microwaving dinners. She paid her bills with money orders. She did not drive.

Upon Mental Status Examination, Plaintiff was dressed appropriately for both the weather conditions as well as the session. Her affect was somewhat anxious and somewhat depressed. She made limited eye contact but when it was made it was very direct. There was no evidence of hallucination or delusion. She appeared to be of approximately average intelligence, and indicated she left school in the 10th grade because she did not like it.

Plaintiff said she had trouble sleeping. Even with medication she sometimes took awhile to fall asleep at night but once asleep stayed asleep throughout the night. In the past six months she'd gained approximately 30 pounds. When asked if life was fair she said no, and when asked if anyone was out to get her she said yes. Overall, her memory functions included specific clear recollection of the current day, the day before, the previous week, events over the past year, and from early in adulthood, as well limitedly from adolescence and childhood. She appeared fully oriented, but

became flustered when asked to subtract serial numbers, and was not able to do so.

Mr. Sutton diagnosed Major Depression, Recurrent Moderate, rule out depressive disorder NOS; no Axis II diagnosis, and a GAF of 50[2] (R. 417). Prognosis was "guarded," apparently due to lack of treatment, such as by a psychologist or psychiatrist.

On April 13, 2002, Plaintiff presented to Dr. DePetro for left knee pain (R. 642). She could not recall any injury, but again noted the car accident of 1976, and said she was not sure if the pain stemmed from that injury. The pain had continued for a couple of days and Naprosyn did not relieve the symptoms. She said it was very painful to walk. Ice did not help. X-rays showed no fracture, dislocation or bony abnormality and mineralization was normal for Plaintiff's age (R. 644). Knee joint space and soft tissue were normal. The impression was that the study was normal. Plaintiff also underwent a Doppler venous sonogram of the left leg which was also normal.

On April 25, 2002, the ALJ denied Plaintiff's prior (2000) application for SSI (R. 418).

On May 31, 2002, Plaintiff presented to psychologist Sutton for an outpatient evaluation (R. 571). She presented as "somewhat guarded, somewhat anxious." She stated that she was becoming more comfortable attending the sessions, but had difficulty leaving her house. She said that her counselor, who came to her house, had to tell her to change from her pajamas to regular clothes, but there was very little reason to get dressed because she did not go out normally.

Upon Mental Status Examination, Plaintiff was alert. She appeared generally oriented. She had noticeable difficulties with memory functions, and appeared anxious, somewhat depressed, and somewhat fearful of some of her surroundings.

---

[2]A GAF of 41-50 indicates **Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

Plaintiff described a recent interaction with her attorney regarding Social Security. She described being somewhat upset that certain information, particularly that from a treating psychiatrist, Dr. Stein, had not been included in the information sent to SS. She was, however, trying to accomplish things in her day to day life without having to leave her apartment very often. She told the psychologist she was interested in finding some place different to live, more toward the country. It appeared to the psychologist that some of Plaintiff's symptoms, such as fear of leaving her home, may have increased, but he also noted this was not totally clear. Plaintiff was diagnosed with Major Depressive Disorder, Recurrent; Panic Disorder; and Rule Out Panic Disorder with Agoraphobia and Amnestic Disorder. Her GAF was again assessed as 50.

On July 1, 2002, Plaintiff filed the present application for SSI (R. 454), alleging disability since 1976. Two days after filing her application, Plaintiff presented for an out-patient evaluation with psychologist Sutton (R. 569). She presented to the session "noticeably distressed." She stated that approximately a week and a half earlier, she had received a letter from Social Security turning down her appeal of the ALJ's decision, and she had eventually started the process all over again. She was quite discouraged, and described being very depressed. She said she was "suicidal" but denied any plans. She said that by the time she had called her counselor, she was able to get herself settled down. Sutton found Plaintiff appeared "somewhat anxious" and "asked for continued assistance in addressing these issues, that is, issues related to Social Security, ability to function independently, potential for work, and potential for being involved more actively in her community."

On July 29, 2002, Plaintiff was not taking Vioxx, but was taking ibuprofen occasionally in between doses of naprosyn (R. 641).

On August 14, 2002, psychologist Sutton completed a form for the State Disability

13

Determination Section (R. 566).  Under "History of treatment for mental disorders," Mr. Sutton wrote: "Pt. acknowledged a long standing treatment relationship with a local agency and stated she has had problems since being struck by a car in 1976."  He reported no testing or test results.  Upon her most recent Mental Status Examination in March 2002, Plaintiff's speech was tangential, suicidal ideation was mild, judgment was moderately deficient, affect was restricted and flat, mood was depressed and anxious, insight was moderately deficient, and psychomotor activity was retarded.  Immediate memory was mildly deficient and social functioning and task persistence and pace were all moderately deficient.  Mr. Sutton's diagnosis was Major Depression, Panic Disorder, and Panic Disorder with Agoraphobia.

On September 9, 2002, less than a month later, psychologist Sutton completed another Agency Reporting form, reporting that Plaintiff was fully oriented, had mild suicidal ideation, had mildly deficient judgment, her affect was broad, her mood was anxious, and her insight, thought content, perception, psychomotor activity, and speech were normal.  She had no suicidal or homicidal ideation, her immediate memory was normal, her recent memory was mildly deficient, her social functioning was mildly deficient, her concentration was mildly deficient, her task persistence was mildly deficient and her pace was severely deficient.  He diagnosed  Major Depression and Generalized Anxiety Disorder.

On September 11, 2002, psychologist Thomas Andrews, Ph.D., completed a mental examination of Plaintiff for the State DDS (R. 607).  Upon Mental Status Examination, he found that Plaintiff's appearance was clean and neat; she was moderately obese; and she sat rather stiffly and moved side to side occasionally. She began to relax during the interview, although she was initially "mildly anxious and complain[ed] that she did feel somewhat tense."  She related otherwise in a very appropriate manner. Her personal hygiene was good; her attitude/behavior was cooperative; she

14

displayed normal eye contact; her sense of humor and ability to carry on a conversation was normal; and she related in a manner best described as normal. Her speech was normal in relevance, coherence, production, pace, and tone quality. She was fully oriented. Her primary mood was normal. Her affect appeared to be broad normal. Her thought processes appeared normal. Her insight was good, her judgment was average, and there were no significant signs of suicidal or homicidal ideation. Immediate, remote, and recent memory were all within normal limits. Concentration, based on serial 7's or 3's, was rated as average. Psychomotor behavior appeared to be mildly to moderately impaired.

Plaintiff described her normal day as follows:

I get up about 10:20 and I make coffee. Just sit a while. I drink my coffee. Lay on the couch or laying in bed most of the day. I sleep two or three hours everyday around 3:00 p.m. I just snack off and on all day when I'm hungry. I just watch TV in the evening or listen to music. I go to bed about 10:30.

(R. 619).

Dr. Andrews opined that Plaintiff's social functioning was within normal limits with the psychologist and staff members, although Plaintiff described her social functional as "essentially uneasy to fearful around others." She reported little to no contact with others, visiting with friends and/or relatives twice a month, and engaging mostly with family members. Dr. Andrews opined Plaintiff's concentration was mildly deficient, her persistence was normal, her pace was normal, her immediate memory was mildly deficient, and her recent and remote memory were normal. She would be able to manage benefits on her own behalf.

Dr. Andrews diagnosed Plaintiff with Panic Disorder with Agoraphobia and Secondary Depression, and Personality Disorder NOS with dependancy and avoidance traits.

On September 24, 2002, State agency reviewing psychologist James Capage Ph.D.

completed a Mental Residual Functional Capacity Assessment ("RFC") (R. 612). He found Plaintiff would not be markedly limited in any functional ability. She would be moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. She was otherwise not limited or not significantly limited.

Dr. Capage assessed Plaintiff's functional capacity as follows:

MER indicates that over the years, the focus of t[reatment] for this 44 y.o. [female] claimant has been for issues of anxiety + depression. She presents as dependent + avoidant of social situations. Her diagnoses have included major depressive d/o, recurrent, gen. anxiety d/o, panic d/o with agoraphobia, + personality d/o NOS.

It appears that she views herself as disabled + is not very motivated to engage in SGA ["substantial gainful activity"]. Her credibility re: ADL's ["activities of daily living"], social functioning etc. is suspect in light of her attitudes.

It seems that she retains the mental emotional capacity to perform routine tasks in a low-pressure setting that makes limited social demands.

(614-615).

Dr. Capage also completed a Psychiatric Review Technique ("PRT"), based on an affective disorder, anxiety disorder, and personality disorder (R. 616). He opined Plaintiff would have a moderate degree of limitation in her activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace, and had had one or two episodes of decompensation,

each of extended duration.

On September 27, 2002, State agency reviewing physician Cynthia Osborne, D.O. completed a physical RFC assessment, opining Plaintiff could lift 50 pounds occasionally, 25 pounds frequently, could stand/walk about six hours in an eight-hour workday, and could sit about six hours in an eight-hour workday. She would have no postural, manipulative, communicative or environmental limitations. Dr. Osborne opined that Plaintiff's RFC should be reduced to medium.

On September 20, 2002, Plaintiff presented to Gabriel Sella, M.D., for an examination upon referral of the State Disability Determination Section ("DDS") (R. 593). Plaintiff, 44 years old, stated she was applying for SSI based on symptoms of fibromyalgia, anxiety, depression, allergies, arthritis, and hearing loss. She also stated that she had had the above complaints for the past 26 years, with the exception of the hearing loss, which she had had for two years.

Upon examination, Plaintiff was 5'1," and weighed 194 pounds (R. 594). Despite her weight, the doctor found there were no mechanical limitations to ambulation or limbs or back range of motion related to obesity. There was no dyspnea related to obesity. Plaintiff did not have to sustain herself close to a wall or the examining table relative to obesity. Plaintiff's uncorrected vision was 20/200 left and right, and with correction was 20/13 left and right. She stated she did not have any photophobia or blurriness of vision. Plaintiff's ear canals and ear drums were normal, and she was able to hear and understand conversational voice within low normal limits.

Plaintiff's deep tendon reflexes were normal and Babinski was negative bilaterally (R. 596). Romberg and tandem walk were "equivocal." She walked without any ambulatory aids. She walked without an antalgic gait, at a normal speed and with normal back and limbs posture. Her ability to bear weight was within normal limits. Toe walking, heel walking, everted and inverted foot walking, squatting and standing from squatting, and hopping on either foot were all normal and not

17

antalgic. Cerebrellar function was normal, sensation was normal, vibration was normal, positional sense was normal, and speech was normal.

Plaintiff's estimated intellectual functioning was compatible with her age and educational level. Zung self-reporting testing for anxiety revealed "most extreme anxiety" and Eysneck self-reporting testing indicated moderate psychosomatic symptomology.

Muscle strength and movement were all normal at 4.5 - 5 out of 5. The ability to grasp and manipulate was normal bilaterally. No active trigger points were found. The doctor found six tender points, and noted: "By definition pain must be present in at least 11 of the 18 locations for the diagnosis of fibromyalgia."

The doctor noted that Plaintiff described "chronic anxiety & depression related to her fibromyalgia and status as a divorced person. She is taking buspar and Trazadone, medicines which apparently control her symptoms." The doctor noted that Plaintiff "described perennial allergies since childhood, however she did not describe any one in particular. She is taking Claritin, a medication which controls her allergic reactions." Regarding Plaintiff's arthritis, Dr. Sella noted that Plaintiff described going to a rheumatologist. She had several non acute arthritic changes on a radiological basis. She had no acute or chronic joints on clinical evaluation.

Audiometry testing showed no response on the right side at 500, 1000, 2000 & 4000 Hz. and a positive response on the left ear to 2000 & 4000 Hz. Dr. Sella did note that Plaintiff could hear the spoken voice well, however.

Dr. Sella opined that Plaintiff's gait was normal without any need for an ambulatory aid. Her ability to bear weight was normal. Her overall muscle strength was 4.5/5 and there was no unilateral muscle weakness. There was no atrophy or unilateral hypertrophy. There were no sensory changes on the head, neck, back or any limbs. Proprioception was normal on the great toe flexion/extension

test.  There were no complaints related to poor proprioception elsewhere.  Deep Tendon Reflexes were all normal and Romberg was "equivocal" for ataxia.  No acute or chronic joint abnormalities were found.  No heat, redness, swelling, thickening, deformity or instability was found in any joint.  Plaintiff's ability to hear and understand conversation voice was within low normal limits.  Dr. Sella found Plaintiff had full range of motion in all joints and her spine (R. 605).  Her straight leg raising was 60 degrees bilaterally, but with reported pain in the lower back.  Dr. Sella also noted that Plaintiff had  4 out of 5 lower extremity muscle strength, but opined that her effort was "Poor."

Upon Mental Status Examination, Plaintiff was fully oriented.  Her recent and remote memory were normal and  her ability to concentrate and maintain attention during the exam were within normal limits.  Her ability to communicate and relate to the examiner and assistants was within normal limits.  She did not appear anxious or distressed about the evaluation.

Dr. Sella found:  "The clinical examination and the investigations are partly compatible with the history and complaints."  Dr. Sella also opined that Plaintiff was "able to do work related activities such as sitting, handling objects, hearing, speaking and traveling."  However, Dr. Sella also noted: "Questionable mental impairment was noted especially with regards to the examinee's capacity for understanding and memory, sustained concentration and persistence as well as social interaction and adaptation."   Dr. Sella concluded:

> Ms. DeGarmo is a 44 year old lady. She presents with the following positive clinical findings: severe anxiety pattern and moderate psychosomatic traits; possible fibromyalgia (partly by definition); loss of hearing on the right ear and partial hearing on the left; mild arthrosis by radiologic evidence; history of perennial allergies under control.

> She may work subject to the limitations described above.

(R. 604).

On October 9, 2002, Plaintiff presented to Dr. DePetro, her treating physician, for refills of

her medications, which she said did "help relieve her symptoms" (R. 640). She wanted to change her allergy medication from Claritin because she did not think that was helping. She also said she had some dizziness for about a week, with a little bit of nausea, when she lay down or arose. She was also having some left wrist pain. Plaintiff reported some dizziness on lying down on the examining table. Also the doctor noted a small nodule in the wrist.

On January 30, 2003, State agency reviewing physician Hugh M. Brown, M.D. completed an RFC assessment of Plaintiff, opining that she could lift 50 pounds occasionally, 25 pounds frequently, stand/walk six hours in an eight-hour workday and sit about six hours in an eight-hour workday (R. 648). She would have no other limitations. Dr. Brown considered Plaintiff's degree of subjective pain and the objective findings of normal gait, motor, and sensory functioning, and lowered Plaintiff's RFC to medium (R. 652).

On February 15, 2003, Plaintiff underwent an MRI of the lumbar spine for her complaints of bilateral lower extremity pain and numbness with back pain (R. 660). The impression was multilevel bulging discs involving L1-L2 through L5-S1. At L5-S1 there was a right paracentral bulge in proximity to the proximal right S1 nerve root and the exiting right L5 nerve root within the neural foramen. The study also showed straightening of the normal lumbar lordosis and disc dessication at L2-L3 and L3-L4.

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2. The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 416.920(b).

3. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

5. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 416.927).

6. The claimant has the following residual functional capacity: to perform light work activity that involves simple, 1-2 step instructions. The claimant must also avoid decision making, contact with the public or groups of people and working in teams. She must also avoid intensive supervision, travel to unfamiliar places and competitive production rate pace. She also functions at the fourth grade level in reading and mathematics.

7. The claimant is unable to return to past relevant work (20 CFR § 416.965).

8. The claimant is a "younger individual" (20 CFR § 416.963).

9. The claimant has a high school equivalent education (20 CFR § 416.964).

10. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

11. Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.20 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as alarm monitor (800/75,000 jobs), as hand packer (400/50,000 jobs), laundry worker (650, 75,000 jobs) and janitor (2,000/200,000 jobs). These numbers represent jobs which exist in the region in which the claimant resides and in the national economy. The alarm monitor and hand packer jobs are sedentary and the other jobs are light in exertional level.

12. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision. (20 CFR § 416.920(f)).

(R.27-28).

## IV. The Parties' Contentions

Plaintiff does not state her contentions in separate headings. From a review of Plaintiff's

Argument, the undersigned finds her contentions are as follows:

1.  The Commissioner ignores the reality and severity of Plaintiff's personality disorder.

2.  The Defendant Commissioner has repeatedly and without a foundation stated that Plaintiff is only depressed because she has not been granted Social Security benefits, or had other welfare-type benefits terminated.

3.  Of all of the mental health professionals who have worked with the Plaintiff, not one of them states that she is ready to work competitively.

4.  [T]he Defendant Commissioner has no foundation for []his finding of only partial credibility.

Defendant contends:

1.  As a preliminary matter, most of DeGarmo's arguments are premised upon evidence from the period which has previously been adjudicated. This evidence from the earlier time period may not be re-adjudicated in connection with the claim which is presently before this Court for review.

2.  DeGarmo has failed to meet her burden of showing that she met the Part "B" criteria under the listings for mental impairments.

3.  The ALJ did find that Plaintiff's personality disorder was severe at step two of the sequential evaluation process.

4.  Substantial evidence supports the ALJ's determination that DeGarmo's allegations regarding her limitations were not entirely credible.

### V. Discussion
### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co. v.

NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Evidence Before the Prior ALJ

As a preliminary matter, Defendant argues that most of Plaintiff's arguments are premised upon evidence from the period which has previously been adjudicated and that this evidence from the earlier time period may not be re-adjudicated in connection with the claim which is presently before this Court for review. The undersigned agrees. As already noted, Plaintiff applied previously for SSI benefits in March 1996 (R. 421). The claim was denied initially and on reconsideration, and was eventually withdrawn by Plaintiff. Plaintiff filed a second application for SSI on July 18, 2000, alleging inability to work since May 1995, due to arthritis, depression, anxiety, weakness in muscles, fibromyalgia, pain, fatigue, and brain injury from a car accident in 1976 (R. 71). That claim was also denied initially and on reconsideration and an ALJ held a hearing on February 14, 2002 (R. 421). Plaintiff was represented by counsel at the hearing. The ALJ's Decision for that claim indicates he considered evidence through February 8, 2002 (R. 424). He entered his Decision on April 25, 2002, finding that Plaintiff was mildly limited in her activities of daily living, moderately limited in concentration, persistence or pace, and moderately limited in social functioning (R. 425). She had never had any episodes of decompensation. He concluded that Plaintiff retained the residual

functional capacity to perform work at the light exertional level with 1-2 step instructions, avoiding decision-making, avoiding the public, groups of people and teamwork, avoiding jobs requiring acute vision, avoiding competitive production rate pace, and needing a 4th grade level of reading, spelling, and math. The Vocational Expert testified there would be a significant number of jobs in the national economy that Plaintiff could perform, despite those limitations. The ALJ therefore found Plaintiff was not under a disability at any time through the date of his decision (R. 429). Plaintiff, who was represented by counsel, did not appeal that decision to the Federal Court, thereby making the ALJ's April 25, 2002, decision the final decision regarding that claim.

The prior ALJ's April 25, 2002, decision is binding on both parties as concerns the evidence that existed prior to that time. See 20 C.F.R. § 416.1455. The undersigned therefore considers only the evidence that existed after that time.

### C. Mental Impairments

Plaintiff argues that the ALJ ignored "the reality and severity of [her] personality disorder." The ALJ found Plaintiff had low average intellectual functioning, depression, anxiety, and a personality disorder (R. 23). He also found these psychological impairments were severe. He did not, however, find any of Plaintiff's mental impairments met the "B" criteria necessary to meet a Listing, and also found the impairments, either alone or in combination, were not disabling.

Plaintiff relies in large part on her counselor's finding that "when Plaintiff attempted to perform substantial gainful activity her anxiety grew to 'an intolerable pitch,'" citing page 145 of the record. First, the record cited is from June 2, 2000, and was therefore already in existence prior to the decision on Plaintiff's previous claim. Second, Ms. Dobrzanski is a counselor/social worker, which is not an acceptable medical source under 416.913(a). The counselor is, instead an "other source" under 416.913(d), which provides only that the ALJ may, but is not required to "also use

evidence from other sources . . . ."

Third, even if the previous two findings did not apply, the statement regarding Plaintiff's attempt to perform gainful activity refers to a time in 1996, when Plaintiff was referred to Vocational Rehabilitation for services "and attempted to work as a waitress" (R. 145). Ms. Dobrzanski states: "The crowds, the pace of the work setting, and the instructions, raised her anxiety to an intolerable pitch." Id. Not only is 1996 well outside the relevant time frame, but the ALJ in the present claim limited Plaintiff to light work involving simple, 1-2 step instructions, no decision-making, no contact with the public, groups of people or teamwork, and no intensive supervision or competitive rate pace (R. 25). Clearly, even the ALJ would not have found Plaintiff's very brief work as a waitress, with "The crowds, the pace of the work setting, and the instructions" suitable work.

Plaintiff next argues: "Every one of the treating mental health professionals agrees that the severity of the Plaintiff's condition is such that she cannot function in a competitive employment situation." Plaintiff does not cite to any particular record in support of this statement. Besides Ms. Dobrzanski, who is not an approved medical source, the undersigned was unable to find in the record, particularly after February 2002, any mental health professional who opined Plaintiff could not work.

Plaintiff further complains that the Commissioner "has repeatedly and without a foundation stated that Plaintiff is only depressed because she has not been granted Social Security benefits, or had other welfare-type benefits terminated." First, the undersigned notes the ALJ never stated that Plaintiff was "only" depressed for this reason, although he did state: "A good deal of her depression is apparently a result of not qualifying for Social Security (SSI) disability" (R. 23). To support this statement, he cited page 565 of the record, in which Robert E. Blake, M.D., evaluated Plaintiff regarding suicidal ideation in February 2002. Under "History of Present Illness" Dr. Blake states:

> This is a 44-year-old female who states that over the past week she has been feeling depressed secondary to her not getting her Social Security.

Additionally, the undersigned notes that in May 2002, Plaintiff told Dr. Sutton she was "somewhat upset" regarding "a recent interaction with her attorney regarding Social Security. She described being somewhat upset that certain information, particularly that from a treating psychiatrist, Dr. Stein, had not been included in the information sent to SS" (R. 571). In July 2002, just two days after filing her current application, Plaintiff told psychologist Sutton that approximately a week and a half earlier, she had received a letter from Social Security turning down her appeal of the ALJ's decision, and she had eventually started the process all over again. She was quite discouraged, and described being very depressed. She said she was "suicidal" but denied any plans. She said that by the time she had called her counselor, she was able to get herself settled down. Sutton found Plaintiff appeared "somewhat anxious" and "asked for continued assistance in addressing these issues, that is, issues related to Social Security, ability to function independently, potential for work, and potential for being involved more actively in her community" (R. 569).

Based on the above, the undersigned finds that the ALJ's statement that "a good deal of [Plaintiff's] depression [was] apparently a result of not qualifying for social Security (SSI) disability benefits" is not reversible error, and is at least supported by substantial evidence.

Regarding the "B" criteria of the mental listings, the ALJ found that Plaintiff's degree of limitation of activities of daily living was "moderate;" her degree of limitations regarding social functioning was "moderate;" her limitation of concentration, persistence or pace was "moderate;" and she had no episodes of deterioration or decompensation of extended duration (R. 23).

On August 14, 2002, Plaintiff's treating psychologist Sutton opined that Plaintiff's speech was tangential, suicidal ideation was mild, judgment was moderately deficient, affect was restricted

26

and flat, mood was depressed and anxious, insight was moderately deficient, and psychomotor activity was retarded. Immediate memory was mildly deficient and social functioning and task persistence and pace were all moderately deficient. On September 9, 2002, less than a month later, psychologist Sutton completed another Agency Reporting form, reporting that Plaintiff was fully oriented, had mild suicidal ideation, had mildly deficient judgment, her affect was broad, her mood was anxious, and her insight, thought content, perception, psychomotor activity, and speech were normal. She had no suicidal or homicidal ideation, her immediate memory was normal, her recent memory was mildly deficient, her social functioning was mildly deficient, her concentration was mildly deficient, her task persistence was mildly deficient and her pace was severely deficient.

On September 11, 2002, examining psychologist Thomas Andrews, Ph.D., found Plaintiff related in a very appropriate manner; her personal hygiene was good; her attitude/behavior was cooperative; she displayed normal eye contact; her sense of humor and ability to carry on a conversation was normal; and she related in a manner best described as normal. Her speech was normal in relevance, coherence, production, pace, and tone quality. She was fully oriented. Her primary mood was normal. Her affect appeared to be broad normal. Her thought processes appeared normal. Her insight was good, her judgment was average, and there were no significant signs of suicidal or homicidal ideation. Immediate, remote, and recent memory were all within normal limits. Concentration, based on serial 7's or 3's, was rated as average. Psychomotor behavior appeared to be mildly to moderately impaired.

Dr. Andrews opined that Plaintiff's social functioning was within normal limits with the psychologist and staff members, although Plaintiff described her social functional as "essentially uneasy to fearful around others." Dr. Andrews opined Plaintiff's concentration was mildly deficient, her persistence was normal, her pace was normal, her immediate memory was mildly deficient, and

her recent and remote memory were normal. She would be able to manage benefits on her own behalf.

Finally, on September 24, 2002, State agency reviewing psychologist James Capage Ph.D. opined Plaintiff would have a moderate degree of limitation in her activities of daily living; maintaining social functioning; and maintaining concentration, persistence or pace, and had had one or two episodes of decompensation, each of extended duration. He also assessed Plaintiff's functional capacity as follows:

> MER indicates that over the years, the focus of t[reatment] for this 44 y.o. [female] claimant has been for issues of anxiety + depression. She presents as dependent + avoidant of social situations. Her diagnoses have included major depressive d/o, recurrent, gen. anxiety d/o, panic d/o with agoraphobia, + personality d/o NOS.

> It appears that she views herself as disabled + is not very motivated to engage in SGA ["substantial gainful activity"]. Her credibility re: ADL's ["activities of daily living"], social functioning etc. is suspect in light of her attitudes.

> It seems that she retains the mental emotional capacity to perform routine tasks in a low-pressure setting that makes limited social demands.

(614-615).

The undersigned finds the above evaluations by mental health professionals substantially support the ALJ's determination that Plaintiff's limitations of activities of daily living, social functioning, and concentration, persistence or pace were all "moderate."

The undersigned United States Magistrate Judge also finds that substantial evidence supports the ALJ's determination that Plaintiff's mental impairments did not meet or equal a listing, and did not, alone or in combination, render her disabled from all work.

### D. Credibility

Plaintiff next argues that the Commissioner had no foundation for her finding of only partial credibility. The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the

demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)).

The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in Craig v. Chater, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .
>
> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated*, *See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, supra at 594. The ALJ found Plaintiff met the first (threshold) step of the analysis. He was therefore required to take into account Plaintiff's statements about her pain, along with "all the available evidence," including her medical history, medical signs, and laboratory findings, any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.) and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical

treatment taken to alleviate it.

The ALJ's decision shows he took into account Plaintiff's statements and testimony regarding her pain and limitations (R. 25). He also took into account Plaintiff's medical history, medical signs, laboratory findings, and objective medical evidence (generally after February 2002) (R. 23-24). He considered her daily activities and noted that her medications were effective. On July 29, 2002, Plaintiff was not taking Vioxx, but was taking ibuprofen occasionally in between doses of naprosyn for pain (R. 641). In September 2002, Dr. Sella noted that Plaintiff was "taking buspar and Trazadone, medicines which apparently control her symptoms." In October 2002, Plaintiff presented to Dr. DePetro, her treating physician, for refills of her medications, which she said did "help relieve her symptoms." The ALJ also correctly noted that Plaintiff used a cane at the hearing, but the record did not support the need for a cane.

Plaintiff particularly argues that the Commissioner "cannot have substantial evidence for any of his findings because these findings run counter to the reports and observations of every treating mental health professional who has evaluated the Plaintiff." (Plaintiff's brief at 17.) The ALJ found that "[n]o treating or examining physician has found the claimant totally disabled." A review of the record since February 2002, supports this finding by the ALJ. Additionally, the ALJ considered the determinations of the non-examining medical and psychological consultants and found that their conclusions were consistent with the other substantial evidence of record. He therefore found their opinions persuasive. 20 CFR § 404.1527(f)(2)(I) provides:

> . . . . State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence, except for the ultimate determination about whether you are disabled.

The undersigned finds that the ALJ therefore properly considered the findings of the State agency medical and psychological consultants. On September 11, 2002, psychologist Thomas Andrews, Ph.D., completed a mental examination of Plaintiff for the State DDS (R. 607). She began to relax during the interview, although she was initially "mildly anxious and complain[ed] that she did feel somewhat tense." She related otherwise in a very appropriate manner. Her personal hygiene was good; her attitude/behavior was cooperative; she displayed normal eye contact; her sense of humor and ability to carry on a conversation was normal; and she related in a manner best described as normal. Her speech was normal in relevance, coherence, production, pace, and tone quality. She was fully oriented. Her primary mood was normal. Her affect appeared to be broad normal. Her thought processes appeared normal. Her insight was good, her judgment was average, and there were no significant signs of suicidal or homicidal ideation. Immediate, remote, and recent memory were all within normal limits. Concentration, based on serial 7's or 3's was rated as average. Psychomotor behavior appeared to be mildly to moderately impaired. Dr. Andrews opined that Plaintiff's social functioning was within normal limits with the psychologist and staff members, although Plaintiff described her social functional as "essentially uneasy to fearful around others." Dr. Andrews opined Plaintiff's concentration was mildly deficient, her persistence was normal, her pace was normal, her immediate memory was mildly deficient, and her recent and remote memory were normal. She would be able to manage benefits on her own behalf.

On September 24, 2002, State agency reviewing psychologist James Capage Ph.D. completed a Mental Residual Functional Capacity Assessment ("RFC") (R. 612). He found Plaintiff would not be markedly limited in any functional ability, although she would be moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; work

in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. She was otherwise not limited or not significantly limited.

Dr. Capage assessed Plaintiff's functional capacity as follows:

MER indicates that over the years, the focus of t[reatment] for this 44 y.o. [female] claimant has been for issues of anxiety + depression. She presents as dependent + avoidant of social situations. Her diagnoses have included major depressive d/o, recurrent, gen. anxiety d/o, panic d/o with agoraphobia, + personality d/o NOS.

It appears that she views herself as disabled + is not very motivated to engage in SGA ["substantial gainful activity"]. Her credibility re: ADL's ["activities of daily living"], social functioning etc. is suspect in light of her attitudes.

It seems that she retains the mental emotional capacity to perform routine tasks in a low-pressure setting that makes limited social demands.

(614-615).

Dr. Capage also completed a Psychiatric Review Technique ("PRT"), opining Plaintiff would have a moderate degree of limitation in her activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace, and had had one or two episodes of decompensation, each of extended duration.

On September 27, 2002, State agency reviewing physician Cynthia Osborne, D.O. completed a physical RFC assessment, opining Plaintiff could lift 50 pounds occasionally, 25 pounds frequently, could stand/walk about six hours in an eight-hour workday, and could sit about six hours in an eight-hour workday. She would have no postural, manipulative, communicative or

environmental limitations. Dr. Osborne opined that Plaintiff's RFC should be reduced to medium.

Based on all the above reviewing and examining physicians' and psychologists' reports , the ALJ determined that Plaintiff would have "moderate" limitations in her activities of daily living, social functioning, and concentration, persistence, and pace. He found that she would not be able to perform complex work involving decision making, but retained the ability to perform simple work involving only one or two step instructions. The ALJ found Plaintiff functioned at only the fourth grade level in reading and math, and determined that she was limited to light work involving simple, 1-2 step instructions, avoiding decision-making, contact with the public or groups of people, working in teams, intensive supervision, travel to unfamiliar places and competitive production rate pace. The undersigned finds substantial evidence supports this determination. The Vocational Expert testified that there would be a significant number of jobs in the national economy for a hypothetical individual with the listed limitations.

The undersigned finds the ALJ properly accorded weight to and considered the opinions of these examining and reviewing physicians and psychologists.

Additionally, Plaintiff's Activities of Daily Living, as reported in January 2003, included making her own meals, including cereal or egg for breakfast; soup or sandwich for lunch; and frozen dinner or sandwich for dinner (R. 491). She performed all her own housework without any help, including, dusting furniture, paying bills, taking out the trash, mopping floors, washing dishes, doing laundry, and vacuuming, although she noted that doing the last four "did her in," and she took breaks often when doing these tasks. She also shopped for food and medication, spending "very little" time because she would get tired and her anxiety would increase. She did not drive. She watched television four to five hours per day and had no hobbies or interests. She stated she used

to write poetry as a hobby, but lost interest and wrote only about one poem per month.[3]

The undersigned finds Plaintiff's own reported daily activities substantially support the ALJ's determination that she was not entirely credible regarding her pain and limitations.

The undersigned therefore finds substantial evidence supports the ALJ's credibility determination and his RFC. The undersigned further finds that substantial evidence supports the ALJ's conclusion that Plaintiff was not disabled at any time through the date of his decision.

## VI. Recommendation

For the reasons herein stated, I find that substantial evidence supports the Commissioner's decision denying Plaintiff's application for SSI, and I accordingly recommend that Defendant's Motion for Summary Judgment [D.E. 32] be **GRANTED**, that Plaintiff's Statement of Errors [D.E. 31] be **DENIED**, and that this matter be dismissed from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above

---

[3] The undersigned notes that Plaintiff did not attempt to get any help for her alleged mental symptoms until her daughter was about to turn 18 and graduate from high school. At that time Plaintiff worried about losing her state welfare benefits and began seeking Social Security benefits. Also at that time Plaintiff began seeing counselors and doctors regarding these symptoms she allegedly had for over 20 years. Her explanation for never having sought help was that if DHHR had known about her mental problems they might have taken her daughter away. The record lacks any information regarding Plaintiff's having raised her daughter through age 18 and high school graduation, apparently without support from the child's father. This begs the question of how Plaintiff, who alleges severe mental and physical impairments for the past 26 years, including inability to leave the house, inability to drive, severe social anxiety, severe depression, severe personality disorder, and severe physical problems, managed to raise a child from birth to age 18 and high school graduation.

will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert</u>. <u>denied</u>, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 21st day of February 2007.

/s *John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE